1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES MORRIS,

11          Petitioner,                    2: 10 - cv - 2611 - MCE TJB

12      vs.

13   JAMES A. YATES,

14          Respondent.          ORDER, FINDINGS AND

15                                RECOMMENDATIONS

16   _____/

17                          I.  INTRODUCTION

18          Petitioner is a state prisoner and is proceeding *pro se* with a petition for writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of twenty-five

20   years to life imprisonment after a jury found him guilty of second degree murder and assault of a

21   child under the age of eight by means of force likely to produce great bodily injury resulting in

22   the child's death.  Petitioner raises several claims in this habeas petition; specifically:  (1) jury

23   instructional error when the jury was instructed that it could convict Petitioner of murder and

24   assault of a child under eight causing death as a natural and probable consequence of aiding and

25   abetting the crime of willfully inflicting upon a child cruel or inhuman corporal punishment or an

26   injury resulting in a traumatic condition ("Claim I"); (2) jury instructional error which allowed

the jury to find Petitioner guilty of murder without finding that either he or his co-defendant harbored malice ("Claim II"); (3) jury instructional error "because the trial court's instructions on the natural and probable consequence doctrine improperly allowed the jury to convict him without ever finding that the charged offenses were a foreseeable consequence of the acts which he may have aided and abetted" (Pet'r's Pet. at p. 12.) ("Claim III"); (4) jury instructional error which lightened the State's burden of proof and removed a factual element of the crime from the jury ("Claim IV"); (5) trial court error in denying Petitioner's request to have the prosecutor remove her cross necklace during trial ("Claim V"); and (6) trial court error in denying motion for new trial based on newly discovered evidence ("Claim VI").  For the following reasons, the habeas petition should be denied.

## II.  FACTUAL BACKGROUND[1]

> Either codefendant Carline Balbuena, whose self-chosen rummy name was "Queen of the Damned," or defendant James Morris, aka "Ultimate Evil," delivered the fatal blows to Balbuena's three-year-old son, Keith Carl Balbuena (KC). . . .
>
> By 8:00 p.m. on November 18, 2005, three-year-old KC was brain dead.  A day earlier, paramedics observed severe bruising on his head, torso, chest, pelvis, and leg.  The child was unresponsive. The emergency room doctor believed KC had been assaulted as he had a large amount of blood between his brain and his skull, pushing the brain to one side; a large amount of fluid in his abdomen; and a possible liver laceration.  It appeared his kidneys had not been functioning normally for at least 24 to 48 hours.  He also had a healing burn injury on the sole of his foot.
>
> A surgeon drilled a hole in KC's skull and removed a bone to evacuate blood and relieve the pressure.  Retinal hemorrhages in his right eye suggested his head had been shaken and hit very hard against a surface.  According to a pediatrician specializing in child abuse, these injuries could not have been sustained from falling from a crib or other household fall; they would require "very significant force" generally associated with falls from major heights or motor vehicle accidents.  In his expert opinion, the injuries, including those to KC's abdomen, were intentionally

---

[1] The factual background is taken from the Court of Appeal of the State of California, Third Appellate District opinion dated October 5, 2009 which Respondent attached to his answer (hereinafter the "Slip Op.").

inflicted and the result of abuse.

The pathologist opined that the cause of death was blunt force injuries to the head, torso and abdomen.  If the head injury had not killed KC, the abdominal injuries would have.  The discoloration along his cheek and lower border of one eye was consistent with having been struck in the eye and was not typical of a fall.  Bruising was extensive, including a bruise on his forehead, three bruises on his chest, a bruise on the inside of the left knee, a bruise on the top of his left foot, a bruise on the instep of the left foot, a bruise on the back of his right ankle, two bruises on his left arm, a bruise on his right forearm, a bruise in the muscle of his left buttock, and bruises on his right upper thigh and left hip.  The force required to sustain the abdominal injury would have been a "kick or punch that goes up . . . into the belly."  The pathologist did not believe the administration of CPR could have caused the abdominal injury.  A child who had sustained these abdominal injuries would have had symptoms including nausea, vomiting, pain, and listlessness.

The emergency personnel were not the first to observe evidence of abuse.  Morris and his three-year-old daughter, Haylee, moved into Balbuena's apartment in August 2005 to share expenses.  Balbuena, with the help of a child care subsidy, enrolled her two children, KC and his one-year-old sister, Angel, in the same preschool Haylee attended.  The director noted that KC's speech was delayed and Angel did not move around like a child her age should.  In October, KC's teacher and an assistant director saw bruising, inflammation, and scratches on the right side of his eye and ear and reported the injury to child protective services (CPS).  CPS investigated the cause of the injury, but both Balbuena and Morris denied using physical punishment or knowing how he received the injury.

Later that month Morris pointed out to the preschool director that KC had burned his foot.  Morris told the director he did not want her to "think that [he] did it."  According to the director, the foot looked "charred," and since the injury had received no medical attention, she told Morris to take KC to the hospital for treatment.  Again she reported the injury to CPS.  KC had a third-degree burn that penetrated the dermis and destroyed the nerves.  The injury had occurred two days earlier and the surrounding tissue had become infected.  About a week later, KC complained to the preschool's assistant director that his foot hurt.  She removed his shoe and sock and saw the foot was no longer bandaged and was bloody.  Balbuena withdrew the children from the preschool on November 8 because her day care subsidy was terminated.

From November 8 until November 17, KC was in the exclusive care and custody of Balbuena and Morris.  They left three-year-old KC and fifteen-month-old Angel alone in the apartment for periods

of time while they went to work at a company located a few minutes away from their apartment.  They would also take turns coming home and taking care of the children for some of the workday.  Life in the apartment by that time had become exceedingly stressful.

It would be an understatement to say that Balbuena cared more about men and their drugs than she did her children.  Already a methamphetamine user, she became a drug dealer to support her husband Noel's expensive habit.  She slept with her supplier and told him he had fathered her second child.  She stole rents from a property she was managing for her mother because she and Noel could not pay their rent, and when Noel left her and she was evicted from her apartment, she lived with friends, eventually in a car with her children, and then moved to Sacramento.  Nevertheless, she desired a relationship with Morris and was willing to pay for his marijuana and for much more than her share of the housing and food costs, give him massages, do his laundry, and to provide him with access to her car and cell phone.

Yet, according to Balbuena at trial, Morris was always angry.  He did not think that she disciplined her children, and he was particularly annoyed with KC and the lack of progress he was making with toilet training.  She described at great length and in disgusting detail how he physically disciplined KC, including forcing him to eat his own feces.  She explained that for the first time she also started spanking KC to placate Morris and to keep him from inflicting more severe punishment on the child.  She testified she had seen Morris punch KC in the stomach on one occasion.  With respect to KC's burned foot, Morris told her he had run a comb down the bottom of his foot while the skin was soft from a bath and the skin peeled off.  Morris justified the injury as punishment because KC had not jumped up and down as instructed.  Balbuena also testified that Morris had hit KC on the side of the head, causing the injuries to his ear that had been reported to CPS.

Balbuena's testimony at trial, however, was at odds with a confession she gave three weeks after KC died, during which she claimed sole responsibility for his death.  She confessed that she had been smoking methamphetamine, without Morris's knowledge, which made her feel "numb and stuff."  She described how she became extremely angry after coming home for lunch on November 16 because KC vomited the Skittles she had given him as a reward for finishing his chicken nuggets and she was forced to clean it up.  She claimed she was so angry she hit his head about 20 to 30 times in 30 minutes.  She believed he got a bruise on his leg when she pushed him into the metal railing on his bed, and a black eye when she threw a plastic container of wipes at him.

Balbuena told her interrogator that she probably gave KC the fatal

blow later that evening.  According to this version, after work she was exasperated because KC had not taken a nap as planned.  She dragged him out of bed and hit him against the wall.  Enraged because he would not jump up and down in the way she demanded, she started spanking him.  She enlisted Morris's help and he hit KC three times with a metal spatula.  Finally she made KC stand in the corner, but when he turned around, she pushed his face against the wall and hit him so hard it made a "huge sound" and his head bounced off the wall.

Morris gave a statement after KC was hospitalized but before he died.  He assumed responsibility for KC's condition because he had placed him in the crib and he believed KC had fallen while climbing out of the crib.  He admitted he made KC jump up and down for up to 30 minutes to punish him for various transgressions.  In the late afternoon on November 16, KC fell and hit his eye while doing jumping jacks.  Morris told KC to take a nap when he left to pick up Balbuena from work, but when they returned, KC was still awake, so he made him stand with his arms outstretched for another 30 minutes.  Later that evening, KC vomited.  Morris put him to bed in another room so he and Balbuena could watch a movie.  The following morning, Morris found KC in the bathroom, coughing and wheezing.  He put KC back to bed but not long after got him up again and took him back to the bathroom.  He told KC to stand up straight, but the toddler's knees buckled and he fell to the floor.  Morris said KC appeared to be choking and his breathing was very shallow.  Hysterical, Balbuena called 911, and according to Morris, he tried to administer CPR.  He was afraid he had hurt KC trying to give him CPR.

An expert for the defense agreed with the pathologist that head trauma was the cause of death and the death appeared to be a homicide.  He opined, however, that the injury to KC's eye could have been caused by a fall, and he had not sustained significant injuries to the abdomen.  Nor did he find the liver had been lacerated.

Morris's sister testified that Balbuena had told her she had once thrown KC across the room.  Another witness testified that Balbuena had told him she had been forced to become involved in the murder of her child.

(Slip Op. at p. 1, 2-8.)

### III.  PROCEDURAL HISTORY

Petitioner appealed his conviction to the California Court of Appeal.  On October 5, 2009, the California Court of Appeal affirmed the judgment.  The California Supreme Court

5

1  summarily denied Petitioner's petition for review on January 13, 2010.

2      Petitioner filed the instant federal habeas petition in September 2010.  Respondent filed

3  his answer in December 2010.  Petitioner filed a traverse in January 2011.

4              IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

5      An application for writ of habeas corpus by a person in custody under judgment of a state

6  court can only be granted for violations of the Constitution or laws of the United States.  See 28

7  U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v.

8  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

9  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

10  and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

11  320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

12  decided on the merits in the state court proceedings unless the state court's adjudication of the

13  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

14  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

15  resulted in a decision that was based on an unreasonable determination of the facts in light of the

16  evidence presented in state court.  See 28 U.S.C. 2254(d).

17      As a threshold matter, a court must "first decide what constitutes 'clearly established

18  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade,

19  538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

20  under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

21  at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

22  application clause, a federal habeas court making the unreasonable application inquiry should ask

23  whether the state court's application of clearly established federal law was "objectively

24  unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

25  not issue the writ simply because the court concludes in its independent judgment that the

26  relevant state court decision applied clearly established federal law erroneously or incorrectly.

6

1   Rather, that application must also be unreasonable." Id. at 411.  Although only Supreme Court

2   law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

3   determining whether a state court decision is an objectively unreasonable application of clearly

4   established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

5   the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

6   applied, we may look for guidance to circuit precedents.").

7                                    V.  ANALYSIS OF PETITIONER'S CLAIMS

8          A.  Claims I, II, III and IV

9          Claims I, II, III and IV all assert various jury instructional error arguments.  The last

10  reasoned decision on these Claims was from the California Court of Appeal on direct appeal

11  which stated the following:

12             It is true that the verdicts do not disclose whether Morris was found
               guilty of second degree murder as the perpetrator of the fatal blows
13             to KC or as the aider and abettor to his codefendant.  Indeed, the
               jurors were not required to agree what his role had been.  Thus, we
14             must consider whether the instructions on aiding and abetting,
               including the natural and probable consequences of felony child
15             abuse, are infirm.  We begin with a summary of the basic
               principles governing the criminal liability of aiders and abettors for
16             crimes they may not have intended, but which are the natural and
               probable consequences of the target crimes they aided and abetted.
17
               An aider and abettor is a person who, "acting with (1) knowledge
18             of the unlawful purpose of the perpetrator; and (2) the intent or
               purpose of committing, encouraging, or facilitating the commission
19             of the offense, (3) by act or advice aids, promotes, encourages or
               instigates, the commission of the crime."  (People v. Beeman
20             (1984) 35 Cal.3d 547, 561 (Beeman).)  The difficult cases involve
               the aider and abettor who assists or encourages the perpetrator to
21             commit one crime, but the perpetrator commits another.  Under
               those circumstances, prosecutors often rely on the natural and
22             probable consequences doctrine.

23             An aider and abettor is "guilty not only of the offense he intended
               to facilitate or encourage, but also of any reasonably foreseeable
24             offense committed by the person he aids and abets. . . . [¶]  It
               follows that a defendant whose liability is predicated on his status
25             as an aider or abettor need not have intended to encourage or
               facilitate the particular offense ultimately committed by the
26             perpetrator.  His knowledge that an act which is criminal was

                                                       7

intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator.  It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury." (<u>People v. Croy</u> (1985) 41 Cal.3d 1, 12, fn. 5.)

In <u>People v. Prettyman</u> (1996) 14 Cal.4th 248 (<u>Prettyman</u>), the Supreme Court reaffirmed the three factors necessary to find that a person was an aider and abetter as first enunciated in <u>Beeman</u>, <u>supra</u>, 35 Cal.3d 547, and added an additional two factors when the particular facts trigger application of the natural and probable consequences doctrine.  The Supreme Court held that the trier of fact must also find that "(4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (<u>Id.</u> at p. 262, fn. omitted.)  The trial court instructed the jury in accordance with these general principles and identified the crime of inflicting physical punishment on a child or felony child abuse as the target crimes Morris aided and abetted (CALCRIM No. 403.)

"Another theory that you may consider in evaluating whether the defendant is guilty of murder or assault on a child resulting in death as charged in Counts I & II, is the natural and probable consequences doctrine of aiding and abetting.

"Before you may decide whether the defendant is guilty of murder or assault on a child resulting in death under this theory, you must first decide whether he or she is guilty of inflicting physical punishment on a child or felony child abuse.
"To prove that the defendant is guilty of murder, or the lesser offense of involuntary manslaughter, or assault on a child resulting in death under this theory, the People must prove beyond a reasonable doubt that:
"1.  The crime of inflicting physical punishment on a child, in violation of Penal Code section 273d(a), or felony child abuse in violation of Penal Code section 273a(a) was committed;
"2.  The defendant aided and abetted that crime;
"3.  A coparticipant, during the commission of that target crime of inflicting physical punishment on a child (PC 273d(a)) or felony child abuse (PC 273a(a)), committed the charged crime of murder or the lesser crime of involuntary manslaughter, or assault on a child resulting in death;
"AND
"4.  The commission of the crime of murder, or the lesser offense of involuntary manslaughter, or assault on a child resulting in death was a natural and probable consequence of the commission of the infliction of physical punishment on a child or felony child abuse.

"A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  If the murder, or the lesser offense of involuntary manslaughter, or the assault on a child resulting in death was committed for a reason independent of the common plan to commit the infliction of physical punishment on a child or felony child abuse, then the commission of murder or the lesser offense of involuntary manslaughter, or assault on a child resulting in death was not a natural and probable consequence of infliction of physical punishment on a child or felony child abuse.

"To decide whether [the] crime of murder or the lesser offense of involuntary manslaughter, or assault on a child resulting in death was committed, please refer to the separate instructions that I will give or have given you on those crimes.

"The People are alleging that the defendant originally intended to aid and abet either inflicting physical punishment on a child or felony child abuse.

"The defendant is guilty of murder or the lesser offense of involuntary manslaughter, or assault on a child resulting in death, if you decide that the defendant aided and abetted one of these crimes and that murder or the lesser offense of involuntary manslaughter or assault on a child resulting in death was the natural and probable result of one of these crimes.  However, you do not need to agree about which of these two crimes the defendant aided and abetted.

"In determining whether a consequence is natural and probable, you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected was likely to occur."  (See CALCRIM No. 403.)

Morris challenges the jury instructions on the natural and probable consequences doctrine on multiple grounds.  Nearly all of his arguments were raised and rejected in <u>Culuko</u>, <u>supra</u>, 78 Cal.App.4th 307, a seminal case that disposes of most of the issues before us.  Before turning to the issues resolved by <u>Culuko</u>, however, we must first address the false premise and the false analogy upon which this appeal is predicated.

A.  Target Crime v. Inherently Dangerous Felony

Morris contends it was error to instruct the jurors they could find him guilty of either murder or assault on a child under the age of eight as a natural and probable consequence of inflicting physical punishment on a child.  Neither murder nor assault on a child under eight, in Morris' view, is a reasonably foreseeable consequence of inflicting punishment as a matter of law.  He analogizes the

predicate or target offense to the unrelated concept of an inherently dangerous felony for felony murder purposes. We begin with the false premise and then consider the false analogy.

The false premise, as aptly pointed out by the Attorney General, is that the foreseeability of the commission of one criminal offense as a result of the commission of another is not an abstract question of law. Morris does not cite, and we have not found, any authority for the proposition that any particular target offense can never trigger the natural and probable consequences doctrine as a matter of law. The law, in fact, is to the contrary. Whether the crime charged is the natural and probable consequence of the target crime is a factual question for the jury to decide. (People v. Cummins (2005) 127 Cal.App.4th 667, 677; People v. Olguin (1994) 31 Cal.App.4th 1355, 1376; People v. Nguyen (1993) 21 Cal.App.4th 518, 530 (Nguyen); People v. Godinez (1992) 2 Cal.App.4th 492, 499.)

In Nguyen, supra, 21 Cal.App.4th 518, we were quite direct that the determination whether a particular crime is a natural and probable consequence of another crime aided and abetted was not to be considered in the abstract as a question of law. (Id. at p. 531.) Justice Sparks further explained: "Rather, the issue is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident. [Citations.] Consequently, the issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (Ibid.) We agree with the Attorney General that it is not the law that the charged offense must be reasonably foreseeable based on the bare elements of the target offense aided and abetted, a mere abstraction to be sure.

Morris diverts our attention from the factual circumstances presented and into the analytic thicket of the absurd – where felony child endangerment, in the abstract, is not inherently dangerous to human life. (People v. Lee (1991) 234 Cal.App.3d 1214, 1219; People v. Caffero (1989) 207 Cal.App.3d 678, 683-684.) He analogizes his target offense under the natural and probable consequences doctrine to an inherently dangerous felony for purposes of the felony-murder rule with the hope of persuading us that it is not reasonable to say that one who aids and abets cruel or inhuman punishment on a child that causes a traumatic physical condition should foresee that the perpetrator might kill the child. Divorced from the disturbing factual circumstances before us, Morris urges us to consider that the crime could be committed even when the traumatic condition is somewhat minor. Since such a crime could not support a felony murder theory of liability because it might be committed in a manner that was not life threatening, Morris concludes it cannot be used as a target offense under the

natural and probable consequences doctrine.  He erroneously blurs two distinct and unrelated concepts.

The natural and probable consequences doctrine is not, as Morris suggests, a substitute for malice.  Malice remains an essential element even when the natural and probable consequences doctrine applies, but the perpetrator, not the aider and abettor, must entertain malice toward the victim.  Felony murder, on the other hand, allows the prosecution to utilize the commission of an inherently dangerous felony as a substitute for malice.  Thus, an entire body of law has evolved around the counterintuitive notion that many inherently dangerous felonies are not, in the abstract, inherently dangerous to human life.  We need not weigh in on the evolution of this branch of the law since the prosecutor did not argue felony murder and the jurors were not instructed on felony murder.  Simply put, a target offense for purposes of the natural and probable consequences doctrine is not analogous to an inherently dangerous felony under the felony-murder rule, and there is no reason to import the odd legal gymnastics surrounding the abstract distinctions between inherently dangerous felonies from felony murder into the natural and probable consequences doctrine.

That is not to say that murder or assault on a child under the age of eight causing death is always a reasonably foreseeable consequence of child abuse in its various forms.  The Supreme Court in Prettyman made it clear that murder is "*not* the 'natural and probable consequence' of 'trivial' activities."  (Prettyman, supra, 14 Cal.4th at p. 269.)  As the court admonished, "To trigger application of the 'natural and probable consequences' doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed."  (Ibid.)

Since Morris does not challenge the sufficiency of the evidence, the question is not whether the abuse in this case was trivial or whether there was a requisite close connection between the abuse and the murder.  Rather, the issue is whether the jury instructions were proper because they allowed the jury to decide whether, under all of the circumstances, murder or assault on a child under eight causing death was reasonably foreseeable as a result of the acts of abuse Morris aided and abetted.  We conclude that the instructions were proper because the question was one of fact, not law, and they did not remove the essential element of finding malice to the jury.  Thus, there was no need to consider whether the target offenses were inherently dangerous.

B.  People v. Culuko

The facts of Culuko are eerily similar to those before us.  As here, defendant Leslie Eugene Garcia moved in with the child victim's mother a couple of months before the murder.  (Culuko, supra, 78

11

Cal.App.4th at p. 317.)  As here, either Garcia or the mother was the perpetrator.  (Id. at p. 313.)  In Culuko, one of them hit seven-month-old Joey Galindo, Jr., so hard in the stomach that it ruptured an artery in the back of his abdomen, and he died of internal bleeding.  (Ibid.)  As here, at various earlier times someone had severely abused the baby, and there was evidence of broken ribs, a broken leg, a smashed face, and bleeding in the brain.  (Ibid.)  Both mothers admitted having used methamphetamine.  (Id. at p. 316.)  Garcia's drug of choice appears to also have been methamphetamine (id. At p., 317); Morris's was marijuana.

Despite the factual similarities, Morris attempts to distinguish Culuko.  He contends that because the jury in his case had the option to find he inflicted physical punishment on a child in addition to the offense of felony child endangerment as charged in Culuko, neither the rational nor the holding applies here.  In his view, since endangerment must be under "circumstances or conditions likely to produce great bodily harm" and the willful infliction of cruel and unusual punishment or injury on a child need not be under such dire circumstances, it is not reasonably foreseeable that a person who inflicts a "traumatic physical condition" might also kill the child.

Morris's attempt to distinguish Culuko is nothing but a recycled version of his argument that murder is not a reasonably foreseeable consequence of felony child abuse as a matter of law.  Certainly murder is not a reasonably foreseeable consequence of many acts of child abuse, including, as Morris points out, disciplining that results in a small bruise.  But those were not the facts in Culuko, nor do they approximate the quality or quantity of the abuse inflicted on KC.  The question is not whether there is a hypothetical in which murder is not a foreseeable consequence of inflicted physical punishment, but whether under all the circumstances presented in this case, a person in Morris'position would have reasonably foreseen that Balbuena's abuse of KC would lead to his death.  Culuko is right on point, both factually and legally.

Morris raises two additional issues resolved against him in Culuko.  First, he complains the jury may have convicted him of murder without finding that either he or Balbuena harbored malice.  If so, he posits, an essential element of murder is missing and a new crime created.

As Culuko reminds us, the Supreme Court has repeatedly "rejected the contention that an instruction on the natural and probable consequences doctrine is erroneous because it permits an aider and abettor to be found guilty of murder without malice."  (Culuko, supra, 78 Cal.App.4th at p. 322.)  In People v. Richardson (2008) 43 Cal.4th 959, the court again confirmed:  "[W]e have previously rejected the argument, advanced by defendant here, that the natural

and probable consequences doctrine unconstitutionally presumes malice on the part of the aider and abettor." (Id. at p. 1021.)  Thus, there is no merit in Morris' contention that the instructions removed a required element of the crime of murder, that the jury in essence created a new crime, and that the instructions on the natural and probable consequences doctrine constituted federal constitutional error.

The jury was also instructed:  "Those who aid and abet a crime and those who directly perpetrate the crime are principals and equally guilty of the commission of that crime:  You need not unanimously agree, nor individually determine, whether a defendant is an aider and abettor or a direct perpetrator.  The individual jurors themselves need not choose among the theories, so long as each is convinced of guilt.  You may have a reasonable doubt that he or she was the aider and abettor, but no such doubt that he or she was one or the other."

The court in Culuko upheld the validity of such an "either/or" instruction and emphasized that despite the instruction, "the jury did have to find that some defendant harbored malice."  (Culuko, supra, 78 Cal.App.4th at p. 323.)  The court explained:  "The 'either/or' instruction was a correct statement of law.  It derived from cases holding the jury need not agree unanimously on whether the defendant was the perpetrator or the aider and abettor, and, accordingly, the trial court need not instruct the jury to agree unanimously on this."  (Ibid.)  Moreover, the court in Culuko reminded the defendant the instruction was based on binding Supreme Court precedent.

"'It is well settled that, to properly convict, a jury must unanimously agree that the defendant is guilty of the statutory offense of first degree murder beyond a reasonable doubt, but it need not decide which of several preferred theories of first degree murder liability governs the case.'  (People v. Lewis (2001) 25 Cal.4th 610, 654 [ ].)  Thus, the judge need not decide unanimously whether a defendant was a direct perpetrator or an aider and abettor, so long as it is unanimous that he was one or the other."  (People v. Wilson (2008) 44 Cal.4th 758, 801-802.)

Second, Morris, like the defendants in Culuko, alleges the instructions allowed the jury to apply the natural and probable consequences doctrine to a crime, rather than to a specific act.  Morris contends the instructions are particularly problematic for a course of conduct crime such as felony child abuse because the target "crime" consists of a series of discrete "acts."  In these circumstances, Morris insists the jury should have been instructed to identify each act of felony abuse, to determine if he aided and abetted each act if he did not perpetrate it, and then to determine whether the murder was a natural and probable consequence of the act he aided and abetted.

Again, the court in <u>Culuko</u> rejected defendant's argument.  The court wrote, "Defendants' instructional model suggests the aider and abettor must intend to facilitate the specific 'act' by which the perpetrator ultimately commits the intended crime.  This is clearly not the law."  (<u>Culuko</u>, <u>supra</u>, 78 Cal.App.4th at p. 326.)  The court reiterated that the natural and probable consequences doctrine is triggered when the perpetrator commits a different or additional crime than the one the aider and abetter intended.  The doctrine, however, does not turn on the aider and abettor's subjective intent but on whether, under all the circumstances, a reasonable person would have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant.  (<u>Id.</u> at p. 327.)

The instruction given in <u>Culuko</u>, as here, was adequate.  In <u>Culuko</u>, "[i]t prevented the jurors from finding Culuko guilty of murder, merely because she aided and abetted Garcia's commission of felony child abuse, if it was unforeseeable that Garcia would commit murder as a result.  At the same time, it *allowed* the jurors to find Culuko guilty of murder if she *did* aid and abet Garcia's commission of felony child abuse, if it *was* foreseeable that Garcia would commit murder as a result.  Moreover, it did not erect an artificial requirement that Culuko had to intend and encourage Garcia to deliver the fatal punch to the abdomen.  It could be sufficient that she intended and encouraged Garcia to brutalize the baby any way he chose, as long as murder was a foreseeable result."  (<u>Culuko</u>, <u>supra</u>, 78 Cal.App.4th at p. 328.)

In the same way, the jurors, as instructed, could not have found Morris guilty of aiding and abetting the murder without finding the murder was a reasonably foreseeable consequence of the act of felony child abuse, which he aided and abetted.  He was not entitled to an instruction requiring the jurors to identify or agree on an act of felony child abuse or whether either of them was an aider and abettor rather than the perpetrator; "a fortiori, they were not entitled to an instruction requiring the jurors to identify or agree on an act of aiding and abetting."  (<u>Culuko</u>, <u>supra</u>, 78 Cal.App.4th at p. 329.)

Again borrowing from principles involving the inapposite felony murder rule, Morris argues that allowing felony child abuse to serve as a predicate crime allows the jurors to find murder in the absence of malice because the underlying felony, felony child abuse, is an integral part of the homicide.  In other words, he contends the doctrine first articulated in <u>People v. Ireland</u> (1969) 70 Cal.2d 522 should be utilized here.  We rejected the application of the <u>Ireland</u> merger concept to the natural and probable consequences doctrine in <u>People v. Karapetyan</u> (2006) 140 Cal.App.4th 1172, 1177-1178.  We explained:  "In <u>Ireland</u>, <u>supra</u>, 70 Cal.2d 522, the court held that felony-murder instructions were improper when they were based upon a felony that was an integral

14

1     part of the homicide.  To allow otherwise 'would effectively
preclude the jury from considering the issue of malice aforethought
2     in all cases wherein homicide has been committed as a result of a
felonious assault – a category which includes the great majority of
3     all homicides.' (Id. at p. 539.)  Because a homicide generally
results from the commission of an assault, every felonious assault
4     ending in death would be elevated to murder, relieving the burden
of the prosecutor to prove malice in most cases.  [Citation.]  This
5     would frustrate the Legislature's intent to punish certain felonious
assaults resulting in death more harshly than other assaults that
6     happened to result in death but were committed without malice
aforethought.  [Citation.]" (Karapetyan, at pp. 1177-1178.)

7

8   (Slip Op. at p. 8-23.)

9        Claims based on instructional error under state law are not cognizable on federal habeas

10  review.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To receive federal habeas relief for

11  an error in jury instructions, Petitioner must show that the error so infected the entire trial that the

12  resulting conviction violates due process.  See Henderson v. Kibbe, 431 U.S. 145, 154 (1977).

13  "Due process requires that criminal prosecutions 'comport with prevailing notions of

14  fundamental fairness' and that 'criminal defendants be afforded a meaningful opportunity to

15  present a complete defense.'" Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting

16  California v. Trombetta, 467 U.S. 479, 485 (1984)).  Additionally, in order to obtain federal

17  habeas relief on this claim, Petitioner "must show that the alleged instructional error had

18  substantial and injurious effect or influence in determining the jury's verdict." Byrd v. Lewis,

19  566 F.3d 855, 860 (9th Cir. 2009) (internal quotation marks and citations omitted), cert. denied, –

20  U.S. –, 120 S.Ct. 2103, 176 L.Ed.2d 733 (2010).  "A substantial and injurious effect means a

21  reasonable probability that the jury would have arrived at a different verdict had the instruction

22  been given." Id. (internal quotation marks and citation omitted).

23        i.  Claim I

24        In Claim I, Petitioner asserts that "[t]he theory that Petitioner herein could be convicted of

25  murder and assault on a child under age of eight, causing death, as a natural and probable

26  consequence of aiding and abetting the crime of inflicting punishment of a child was legally

incorrect." (Pet'r's Pet. at p. 6.)  As noted by the Court of Appeal, the jury was instructed as follows:

> Another theory you may consider in evaluating whether the defendant is guilty of murder or assault on a child resulting in death as charged in Counts I & II, is the natural and probable consequences doctrine of aiding and abetting.
>
> Before you may decide whether the defendant is guilty of murder or assault on a child resulting in death under this theory, you must first decide whether he or she is guilty of inflicting physical punishment on a child or felony child abuse.
>
> To prove that the defendant is guilty of murder, or the lesser offense of involuntary manslaughter, or assault on a child resulting in death under this theory, the People must prove beyond a reasonable doubt that:
>
> 1.  The crime of inflicting physical punishment of a child, in violation of Penal Code section 273d(a), or felony child abuse in violation of Penal Code section 273a(a) was committed;
> 2.  The defendant aided and abetted that crime;
> 3.  A coparticipant, during the commission of that target crime of inflicting physical punishment on a child (PC 273d(a)) or felony child abuse (PC 273a(a)), committed the charged crime of murder or the lesser crime of involuntary manslaughter, or assault on a child resulting in death;
> AND
> 4.  The commission of the crime of murder, or the lesser offense of involuntary manslaughter, or assault on a child resulting in death was a natural and probable consequence of the commission of the infliction of physical punishment on a child or felony child abuse.
>
> A *coparticipant* in the crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.
>
> A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  If the murder, or the lesser offense of involuntary manslaughter, or the assault on a child resulting in death was committed for a reason independent of the common plan to commit the infliction of physical punishment on a child or felony child abuse, then the commission of murder or the lesser offense of involuntary manslaughter, or assault on a child resulting in death was not a natural and probable consequence of infliction of physical punishment on a child or felony child abuse.
> To decide whether crime of murder or the lesser offense of

1   involuntary manslaughter, or assault on a child resulting in death
    was committed, please refer to the separate instructions that I will
2   give or have given you on those crimes.

3   The People are alleging that the defendant originally intended to
    aid and abet either inflicting physical punishment on a child or
4   felony child abuse.

5   The defendant is guilty of murder or the lesser offense of
    involuntary manslaughter, or assault on a child resulting in death, if
6   you decide that the defendant aided and abetted one of these crimes
    and that murder or the lesser offense of involuntary manslaughter
7   or assault on a child resulting in death was the natural and probable
    result of one of these crimes.  However, you do not need to agree
8   about which of these two crimes the defendant aided and abetted.

9   In determining whether a consequence is natural and probable, you
    must apply an objective test, based not on what the defendant
10  actually intended, but no what a person of reasonable and ordinary
    prudence would have expected was likely to occur.

11

12  (Clerk's Tr. at p. 749-50.)

13      Petitioner does not raise an insufficiency of the evidence argument.  Instead, his argument

14  is that the jury instructions on the natural and probable consequences doctrine were legally

15  incorrect.  Petitioner asserts that the instructions were legally incorrect because inflicting physical

16  punishment on a child is a non-life threatening crime.  Petitioner states that "felony child

17  endangerment is not inherently dangerous to human life and thus may not serve as the predicate

18  for second degree felony-murder."  (See Pet'r's Pet. at p. 8.).

19      At the outset, to the extent that Petitioner relies on state law, he is not entitled to federal

20  habeas relief.  See Estelle, 502 U.S. 62, 68 ("[I]t is not the province of a federal habeas court to

21  reexamine state-court determinations on state-law questions.).  Petitioner fails to show that the

22  jury instructions violated his due process rights.  First, as noted by the Court of Appeal, this was

23  a natural and probable consequences case, not a felony-murder rule case.  See People v. Culuko,

24  78 Cal. App. 4th 307, 322, 92 Cal. Rptr. 2d 789 (2000) ("The natural and probable consequences

25  doctrine operates independently of the second degree felony-murder rule.  It allows an aider and

26  abettor to be convicted of murder, without malice, even where the target offense is not an

17

1   inherently dangerous felony.")  Additionally, the natural and probable consequences doctrine

2   "does not mean that the issue is to be considered in the abstract as a question of law.  Rather, the

3   issue is a factual question to be resolved by the jury in light of all of the circumstances

4   surrounding the incident."  People v. Nguyen, 21 Cal. App. 4th 518, 531, 26 Cal. Rptr. 2d 323

5   (1993).  Petitioner fails to show that allowing the jury to decide whether under all of the

6   circumstances, murder or assault on a child under eight causing death was reasonably foreseeable

7   as a result of the acts that Petitioner aided and abetted was improper for the reasons stated by the

8   Court of Appeal.  Thus, Petitioner failed to show that the Court of Appeal's decision was an

9   unreasonable application of clearly established federal law.  Claim I should be denied.

10                         ii.  Claim II

11          In Claim II, Petitioner asserts that the jury instructions permitted the jury to find

12   Petitioner guilty of murder without a finding that Petitioner or his co-defendant harbored malice,

13   that his conviction violated the merger rule of People v. Ireland, 70 Cal. 2d 522, 75 Cal. Rptr.

14   188, 450 P.2d 580 (1969) and that he was allowed to be convicted of a crime which did not exist

15   in the Penal Code.

16          The California courts have repeatedly upheld the "natural and probable consequences"

17   doctrine as proper under California law.  See Culuko, 78 Cal. App. 4th at 322, 92 Cal. Rptr. 2d

18   789 ("The [California] Supreme Court has repeatedly rejected the contention that an instruction

19   on the natural and probable consequences doctrine is erroneous because it permits an aider and

20   abettor to be found guilty of murder without malice.") (citing People v. Garrison, 47 Cal. 3d 746,

21   777-78, 254 Cal. Rptr. 257, 765 P.2d 419 (1989), People v. Bunyard 45 Cal. 3d 1189, 1231-32,

22   249 Cal. Rptr. 71, 756 P.2d 795 (1988)).  The natural and probable consequences instruction did

23   not relieve the prosecution of its burden of proof.  The Ninth Circuit has stated that the jury

24   instructions on California's natural and probable consequences doctrine do not shift the burden

25   of proving intent and do not violate due process.  See Mendoza v. Runnels, 251 Fed. Appx. 406,

26   409 (9th Cir. 2007) (rejecting argument that jury instructions violated clearly established federal

law because "this Court has already determined that California's natural-and-probable-consequences doctrine does not violate due process."); see also Spivey v. Rocha, 194 F.3d 971, 977 (9th Cir. 1999) (rejecting argument that aiding and abetting liability for murder "predicated on the basis that murder may be the natural and probable consequence of simple battery" does away with the malice element of murder).  Thus, Petitioner is not entitled to federal habeas relief on this argument.

Next, Petitioner asserts that the jury instructions were a violation of the "merger" rule set forth in People v. Ireland, 70 Cal.2d 522, 75 Cal. Rptr. 188, 450 P.2d 580 (1969).  The "merger" rule outlined in Ireland has been explained as follows:

> In People v. Ireland, supra, 70 Cal.2d 522, we adopted the merger rule in a case involving the underlying felony of assault with a deadly weapon, where the defendant had shot and killed his wife. The jury was instructed that it could return a second degree felony-murder verdict based upon the underlying felony of assault with a deadly weapon, and the defendant was convicted of second degree murder.
>
> On appeal, this court reversed, reasoning that "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide had been committed as a result of a felonious assault – a category which includes the great majority of homicides.  This kind of bootstrapping finds support neither in logic nor in law." . . . The court therefore concluded that the offense of assault with a deadly weapon, which was "an integral part of" and included in fact" within the homicide, could not support a second degree felony-murder instruction . . . .

People v. Hansen, 9 Cal. 4th 300, 312, 36 Cal.Rptr. 2d 609, 885 P.2d 1022 (1994), overruled on other grounds, People v. Chun, 45 Cal. 4th 91 Cal. Rptr. 3d 106, 203 P.3d 425 (2009).  However, as noted by the state court, the felony-murder rule was not applicable to Petitioner's case which involved the natural and probable consequences doctrine.  (See Slip Op. at p. 22 (citing People v. Karapetyan, 140 Cal. App. 4th 1172, 1177-78 (2006)).  It is not proper to submit a different interpretation of the applicability of the Ireland merger test from that of the state court in these federal habeas proceedings.  See Estelle, 502 U.S. 62, 68 ("[I]t is not the province of a federal

1   habeas court to reexamine state-court determinations on state-law questions.); <u>see</u> <u>also</u> <u>Campaz v.</u>

2   <u>Yates</u>, Civ. No. 10-2967, 2012 WL 1131522, at *8-9 (E.D. Cal. Mar. 30, 2012) (stating that a

3   federal habeas court cannot substitute its interpretation of <u>Ireland</u> for that of the state court).

4   Accordingly, Petitioner is not entitled to federal habeas relief on this argument.

5        Petitioner's third argument within Claim II is that the jury instructions permitted the jury

6   to convict Petitioner of murder without a finding of malice unconstitutionally created a "common

7   law crime." (Pet'r's Pet. at p. 10-11.)  More specifically, Petitioner asserts that, "the addition of

8   the 'either/or' instructions allowed the jury to convict Petitioner of murder without the finding

9   that the state had prove the existence of malice as to either of the defendants." (<u>Id.</u> at p. 11.)

10  Petitioner's contention appears to be that the following instruction was given in error:

11            Those who aid and abet a crime and those who directly perpetrate
             the crime are principals and equally guilty of the commission of
12            that crime.  You need not unanimously agree, nor individually
             determine, whether a defendant is an aider and abettor or a direct
13            perpetrator.  The individual jurors themselves need not choose
             among the theories, so long as each is convinced of guilt.  You may
14            have reasonable doubt that the defendant was the direct perpetrator,
             and a similar doubt he or she was the aider and abettor, but no such
15            doubt that he or she was one or the other.

16  (Clerk's Tr. at p. 749-49.)

17       Jury instructions cannot be read in isolation, but must be read as a whole in determining

18  whether Petitioner's due process rights were violated.  See <u>Estelle</u>, 502 U.S. at 72.  In this case,

19  the jury was also instructed that to convict Petitioner under the natural and probable

20  consequences doctrine that "a coparticipant, during the commission of that target crime of

21  inflicting physical punishment on a child (PC 273d(a)) or felony child abuse (PC 273a(a)),

22  committed the charged crime of murder or the lesser crime of involuntary manslaughter, or

23  assault on a child resulting in death." (Clerk's Tr. at p. 749.)  The jury was also instructed that

24  malice aforethought is an element of murder.  (<u>See id.</u> at p. 745-46.)  Thus, the instruction

25  Petitioner complains about did not dispense of the element of malice, it only explained to the jury

26  that they need not unanimously agree whether the defendant was the perpetrator or the aider and

abettor.  See Culuko, 78 Cal. App. 4th at 323, 92 Cal. Rptr. 2d 789 ("The 'either/or instruction

was a correct statement of law.  It derived from cases holding the jury need not agree

unanimously on whether the defendant was the perpetrator or the aider and abettor[.]").  For the

foregoing reasons, Petitioner has failed to show that he is entitled to federal habeas relief on any

of his arguments within Claim II.

                        iii.  Claim III

        In Claim III, Petitioner argues that:

> [B]ecause causation is the premise of the natural and probable
> consequence doctrine, the jury must be told of its duty to find that
> the ultimate act which the state seeks to hold a defendant
> responsible is casually related (or the natural and probable
> consequence of) the actual act that the defendant aided and abetted.

(Pet'r's Pet. at p. 13-14.)  As noted by the Court of Appeal, a similar argument was raised and

rejected in Culuko, 78 Cal. App. 4th 307, 92 Cal. Rptr. 2d 789.  In Culuko, 78 Cal. App. 4th at

326, 78 Cal. App. 4th 307,  the court explained that the defendants argued that the trial court

should have instructed that the natural and probable consequences doctrine applies to an "act."

The defendants asserted that the jurors should have been required to "(1) identify each particular

act of felony child abuse; (2) determine whether the defendant who did not perpetrate that act of

felony child abuse did aid and abet it; and, if so (3) determine whether murder was the natural

and probable consequence of that act of felony child abuse."  Id.  The court noted that the jurors

were instructed to determine whether "'[t]he crime of murder was a natural and probable

consequence of the commission of the crime of felony child endangerment."  See id.  Similar to

Culuko, the jury in Petitioner's case was instructed to determine whether "the commission of the

crime of murder. . . was a natural and probable consequence of the commission of the infliction

of physical punishment on a child or felony child abuse."  (Clerk's Tr. at p. 749.)  In determining

that the instructions were sufficient, the California Court of Appeal stated in Culuko:

> We believe the best way to convey the crucial legal principle is by
> an entirely separate instruction.  Here, the trial court gave such an
> instruction.  It explained: "In determining whether the crime of

murder was a natural and probable consequence, you must determine whether a reasonable person in the [d]efendant's position would have known that the crime was a reasonable foreseeable consequence of the act aided and abetted.  In making this determination, you must consider those circumstances which the defendant knew, taking into account all the facts and circumstances surrounding the particular defendant[' ]s conduct."

This instruction was adequate.  It prevented the jurors from finding Culuko guilty of murder, merely because she aided and abetted Garcia's commission of felony child abuse, if it was unforeseeable that Garcia would commit murder as a result.  At the same time, it *allowed* the jurors to find Culuko guilty of murder if she *did* aid and abet Garcia's commission of felony child abuse, and if it *was* foreseeable that Garcia would commit murder as a result.  Moreover, it did not erect an artificial requirement that Culuko had to intend and encourage Garcia to deliver the fatal punch to the abdomen.  It could be sufficient that she intended and encouraged Garcia to brutalize the baby any way he chose, as long as murder was a foreseeable result.

Indeed, defendants concede that, "[i]n the typical case," this instruction would be adequate to "resolve any confusion,"  They argue, however, it was inadequate here because felony child abuse is a continuing course of conduct crime, and therefore the jurors did not have to agree unanimously on the "act" or "acts" constituting felony child abuse.

Precisely *because* unanimity was not required, however, the jury instructions were adequate.  Defendants were not entitled to an instructions requiring the jurors to identify or agree on an act of felony child abuse.  Defendants also were not entitled to an instruction requiring the jurors to agree on whether either of them was guilty as an aider and abettor rather than as a perpetrator; a fortiori, they were not entitled to an instruction requiring the jurors to identify or agree on an act of aiding and abetting.  Defendants *were* entitled to an instruction limiting their liability for murder under the natural and probable consequences doctrine to the reasonably foreseeable consequences of an act of felony child abuse which they aided and abetted.  Such an instruction was given.  We reject defendants' claim of error.

Culuko, 78 Cal. App. 4th at 329-29, 92 Cal. Rptr. 789 (footnote omitted).

Similar reasons as discussed in Culuko dictate why Petitioner failed to show that the jury instructions in his case did not violate his due process rights.  Petitioner's jury was instructed on the elements of aider and abettor liability under California law.  It was explained that "[s]omeone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she

22

1  specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the

2  perpetrator's commission of the crime." (Clerk's Tr. at p. 748.)  Petitioner's jury was also

3  further instructed that "the fact that a person is present at the scene of a crime or fails to prevent

4  the crime does not, by itself, make him or her an aider and abettor." (Id.)  Additionally, similar

5  to the instruction in Culuko, Petitioner's jury was instructed that, "[i]n determining whether a

6  consequence is natural and probable, you must apply an objective test, based not on what the

7  defendant actually intended, but on what a person of reasonable and ordinary prudence would

8  have expected was likely to occur." (Id. at p. 750.)

9       Based on the instructions given by the trial court, Petitioner failed to show that the Court

10  of Appeal decision rejecting this Claim was an unreasonable application of clearly established

11  federal law.  See, e.g., Potter v. Hornbeak, Civ. No. 08-1174, 2011 WL 306180, at *5-6 (E.D.

12  Cal. Jan. 27, 2011) (Berzon, J., sitting by designation) (citing to Culuko and rejecting habeas

13  petitioner's argument that jury "instructions on aider and abettor liability permitted her

14  conviction for murder without evidence of an intentional act or advice that aided, promoted,

15  encouraged, or instigated the commission of the target crime of felony child abuse, and that such

16  ambiguity in the instruction improperly relieved the state of its burden to prove every fact

17  necessary to her conviction.").  Accordingly, Claim III should be denied.

18                    iv.  Claim IV

19       In Claim IV, Petitioner argues that the jury instructions as stated in Claims I-III lightened

20  the State's burden of proof and removed a factual element of the crime (malice) in violation of

21  Petitioner's due process and fair trial rights.  (See Pet'r's Pet. at p. 12.)  For the reasons described

22  supra, Petitioner failed to show that the Court of Appeal's decision on his jury instruction

23  arguments was an unreasonable application of clearly established federal law.  Accordingly,

24  Claim IV should be denied.

25       B.  Claim V

26       In Claim V, Petitioner asserts that the trial court erred in denying Petitioner's request to

23

have the prosecutor remove her cross necklace during trial.  Petitioner argues that by being

allowed to wear the cross at trial, "[t]he jury most likely had their minds made up when they

visibly observed the cross being worn by the prosecutor for all to see, and prejudicially swaying

the jurors to 'take sides' with the prosecutor."  (Pet'r's Pet. at p. 17.)  The last reasoned decision

on this issue was from the California Court of Appeal which stated the following:

> The prosecutor wore a very thin, metallic cross measuring about an inch by one-half inch on a delicate chain. The trial judge observed that she would not have even noticed it if it had not been called to her attention.  Morris claims the trial court deprived him of a fair trial by allowing the prosecutor to wear the cross.  Although in a hypothetical case the constitutional issues could be grave, we conclude that on the record before us Morris' right to a fair trial has not been compromised.  Nor do we find on these facts a violation of the establishment clause of the United States Constitution.  (U.S. Const., 1st Amend.)

> In refusing to compel the prosecutor to hide or discard the small cross, the court distinguished cases in which attorneys wore clerical collars and explained its rationale at some length as follows:  "But, all three cases [cited by defendant] dealt with ordained priests wearing clerical collars while they were representing their clients.  That is substantially different than one of the attorneys wearing a very small cross, and to be truthful I would not have noticed the cross if it was not pointed out to me.  It is silver, on a silver chain.  It's very light in color.  It's about maybe an inch lengthwise.  Although the cross is historically a symbol of religion, [in] this day and age it can also be construed as a fashion statement.  So, I do not see how it would in any way pose danger to imparing [*sic*] a fair trial process.  It's a different thing if one of the parties had a huge volume of the Bible in front of them, or if the cross was much bigger, but the cross she is wearing is so small, an inch.  Okay.  Because I can't imagine it having the effect that the defense is arguing here on the jury psychologically, emotionally, consciously or subconscious[ly], or if that effect would even be transferred to the witnesses I think is extremely farfetched.  I understand [Evidence Code section] 789 bars getting into any of the witnesses['] religious beliefs.  That's clearly not going to happen during this trial, but based on the cases that the defense has provided, I see a clear distinction, and I'm not going to order [the prosecutor] not to wear that cross.  That's just something she does every day in her daily life, and I think her first amendment rights here outweigh any risk of danger of impairing [a] fair trial because I see no danger, unless there's another case you bring on point, more on point, I'm going to deny your motion."

> We agree that cases involving clerical collars are of marginal

24

utility.  (See, e.g., <u>La Rocca v. Lane</u> (N.Y. 1975) 366 N.Y.S.2d 456.)  As the trial court pointed out, clerical collars send a far different message than a small, hardly noticeable silver cross.  The clerical collar connotes a special religious status conferred on only those who have achieved a prescribed stature and poses the danger that jurors might ascribe an authority or credibility to a person who has earned the collar.  Thus, it is hardly surprising that courts would find the collar breaches the neutrality the Constitution demands.

Nor, however, do we find the cases cited by the Attorney General dispositive.  While <u>Draper v. Logan County Pub. Library</u> (2003) 403 F.Supp.2d 608 (<u>Draper</u>) and <u>Nichol v. ARIN Intermediate Unit 28</u> (2003) 268 F.Supp.2d 536 (<u>Nichol</u>) both involve public employees wearing small crosses as the prosecutor did in this case, they were civil cases brought by the employees to vindicate their rights under the First Amendment to the United States Constitution (hereafter First Amendment).  Neither case implicated a criminal defendant's right to a fair trial.  The courts in both cases emphasized the importance of a public employee's right to free speech and the free exercise of his or her religion, but neither had to consider the important and countervailing right of a criminal defendant to a fair trial.

An appellate court in Texas, following the rationale of <u>Draper</u> and <u>Nichol</u>, did uphold a prosecutor's right to wear a one-inch cross, which the trial court had found was not "obvious or intrusive."  (<u>Green v. Texas</u> (Tex. [Ct. App.] 2006) 209 S.W.3d 831, 833.  The trial judge, as here, had not observed the cross prior to the defendant's raising the issue.  The Court of Appeals commented that the establishment clause does not require the government to be hostile to religion and uphold the trial court's ruling allowing the prosecutor to wear the cross.  (<u>Ibid.</u>)

We agree with defendant that the Constitution preserves the religious neutrality of the courtroom and it may be necessary to restrict some exercise of the First Amendment to avoid violating the establishment clause.  (<u>Fox v. Los Angeles</u> (1978) 22 Cal.3d 792, 798.)  We also believe that because the prosecutor is, in the eyes of the jurors, the personification of the state, we must be particularly sensitive to a defendant's claim that any religious adornments have the potential to cross the fuzzy line between the free exercise and establishment clauses of the First Amendment.  A criminal defendant's right to a fair trial is an interest far stronger than that of the public employers in <u>Draper</u> and <u>Nichols</u> and one we must consider with extreme care and sensitivity.

Although we must consider the ultimate constitutional issue de novo (<u>Berry v. Department of Social Services</u> (9th Cir. 2006) 447 F.3d 642, 648), we must defer to the trial judge's factual assessment of the size and impact of the cross.  She found that the

1        cross was small in size and barely noticeable.  She believed any
      message the cross might convey was ambiguous, as the slender
2        silver cross could be construed equally as a fashion statement or as
      a religious symbol.  Morris does not contest the factual findings of
3        the trial court.

4        As a result, we do not believe the prosecutor's small cross
      compromised the fairness of the trial in this case, and we are
5        unwilling to restrict a lawyer's First Amendment right to wear a
      small piece of jewelry the trial judge barely noticed and found
6        unlikely to influence anyone who might have seen it.

7        For the same reasons, we reject Morris's argument that the
      prosecutor's cross interjected religion into the trial in violation of
8        Evidence Code section 789.  Section 789 provides:  "Evidence of
      his religious beliefs or lack thereof is inadmissible to attack or
9        support the credibility of a witness."  Beyond the obvious
      distinction that the prosecutor was not a witness, we conclude that
10       the mere wearing of a small cross, as described by the trial court in
      this case, was not a statement or opinion of the prosecutor's
11       religious belief.  Section 789 does not apply here.

12 (Slip Op. at p. 23-27.)

13       Petitioner has failed to show that he is entitled to federal habeas relief on this Claim.  He

14 has not illustrated that the Court of Appeal's decision was an unreasonable application of clearly

15 established federal law nor that it resulted in a decision based on an unreasonable determination

16 of the facts.  Petitioner cites to no United States Supreme Court authority which holds that the

17 wearing of a small cross necklace by the prosecutor violates Petitioner's due process and fair trial

18 rights by impermissibly influencing the jury.  See Lockyer, 538 U.S. at 71 ("[C]learly established

19 federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the

20 Supreme Court at the time the state court renders its decision.") (internal quotation marks and

21 citation omitted).

22       Even if Petitioner's claim states a claim that arises under "clearly established federal

23 law," the Court of Appeal's decision was not an unreasonable application of that law.  It was not

24 unreasonable in distinguishing the cases relied on by both Petitioner and the State.  La Rocca v.

25 Lane, 366 N.Y.S.2d 456, 47 A.D. 243 (App. Div. 2d Dep't 1975) is distinguishable because in

26 that case the attorney was wearing a clerical collar as opposed to a small silver cross.  The Court

of Appeal's distinguishment of <u>Nichol v. Arin Intermediate Unit 28</u>, 268 F. Supp. 2d 536 (W.D. Pa. 2003) and <u>Draper v. Logan County Public Library</u>, 403 F. Supp. 2d 608 (W.D. Ky. 2005) was also not an unreasonable application of clearly established federal law as neither case implicated a defendant's right to a fair trial.  Rather, as explained by the state court, both of those cases involved public employees rights under the First Amendment.

Petitioner argues that the prosecutor's cross impermissibly influenced the jury to convict him.  The Supreme Court took up the issue of whether courtroom practices impermissibly influence a jury in violation of a defendant's fair trial rights in <u>Holbrook v. Flynn</u>, 475 U.S. 560 (1986).  In <u>Holbrook</u>, the specific issue was whether supplementing the customary courtroom security force with four uniformed state troopers seated in the first row of the spectator's section violated the defendant's constitutional right to a fair trial.  <u>See id.</u> at 562.  While not completely the same factual scenario as in <u>Holbrook</u>, <u>Holbrook</u> is instructive because in both cases, the petitioners argued that their fair trial rights were violated by something within the courtroom that would prejudice the defendant.  In <u>Holbrook</u>, the petitioner asserted that the presence of the uniformed officers would suggest to the jury that the defendants were of bad character.  <u>See id.</u> In Petitioner's case, he asserts that the cross necklace would taint the jury to "take sides" with the prosecutor.  (<u>See</u> Pet'r's Pet. at p. 17.)

The United States Supreme Court explained that, "[C]entral to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial."  <u>Holbrook</u> 475 U.S. at 567.  The Supreme Court continued by noting that, "[w]henever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play."  <u>Id.</u> at 570.

In <u>Holbrook</u>, the Supreme Court explained the difference between using identifiable security officers within the courtroom as compared to shackling the defendant at trial. Specifically, in deciding that the use of more uniformed officers in the courtroom did not violate the defendant's Constitutional rights, the Supreme Court noted that there was a wide range of inferences that a juror could draw from the officers' presence. <u>See id.</u> at 568. Similar to <u>Holbrook</u>, there is a wide range of things that the jury could have drawn from a prosecutor wearing a small cross necklace at trial, even if they were able to see it. As noted by the state court, it could simply have been interpreted as a piece of jewelry worn by the prosecutor. At a minimum, Petitioner has not shown that he was prejudiced at trial by the prosecutor wearing a small cross as a necklace.

Additionally, it is worth noting that this case is even one more step removed from <u>Holbrook</u> where the Supreme Court said that the defendant's fair trial rights were not violated. In <u>Holbrook</u>, the defendant argued that the presence of uniformed officers prejudiced him by purportedly suggesting to the jury that the defendant is of "bad character." <u>See</u> 475 U.S. at 562. The prosecutor's choice in accessories does not suggest anything against the Petitioner. Accordingly, for all of the foregoing reasons, Petitioner has failed to show that he is entitled to federal habeas relief on Claim V.

C. Claim VI

In Claim VI, Petitioner asserts that the trial court erred in denying his motion for a new trial based on newly discovered evidence. The California Court of Appeal stated as follows in analyzing this Claim:

> Finally, Morris claims he was entitled to a new trial because one of his fellow inmates, a convicted murderer, was prepared to testify that Balbuena told him she intended to lie at trial and say that she believed Morris had forced KC to eat his own feces. We review the trial court's denial of the new trial motion based on newly discovered evidence for an abuse of discretion. (<u>People v. Earp</u> (1999) 20 Cal.4th 826, 890.)

> In denying the motion, the court found that "it is not reasonably

28

probable that a different result would have occurred.  Ms. Balbuena's credibility was extremely suspect and attacked throughout the entire trial.  [¶]  Both counsel . . . impeached her numerous times and argued she was not credible.  She was an admitted liar.  She gave two different versions entirely in court and to the detective, so already her credibility was much questioned and challenged, however, also the specific statement you referred to about Mr. Morris having forced the child to eat his own feces is one piece of a great amount of evidence in this case, so even if that one piece was challenged or negated, I do not find given the entirety of the evidence that it's probable a different result would have occurred, so based on that, I am going to deny your motion for a new trial."

It would be impossible on this record to conclude the trial court abused its discretion.  As the trial court aptly pointed out, Balbuena was an unabashed liar.  She confessed to abusing KC throughout the day he died and admitted that she had hit his head into the wall so hard she thought the blow could have caused his death.  But at trial she repudiated her confession and blamed Morris for abusing KC.  The newly discovered evidence did little more than confirm what the jurors already knew – Balbuena lied.  Thus, like the trial court, we conclude the inmate's testimony, if believed, was not of a nature to "render a different result probable on retrial."  (People v. Delgado (1993) 5 Cal.4th 312, 328.)  The evidence did not exonerate defendant; it simply reinforced that Balbuena, the witness, had little credibility.  As a result, defendant is not entitled to a new trial.

(Slip Op. at p. 27-28.)

Respondent argues that Claim VI is unexhausted.  Before proceeding with a federal habeas corpus petition, a state prisoner must first exhaust state court remedies.  See 28 U.S.C. § 2254(b).  Exhaustion requires that the federal claim be fairly presented to the state's highest court to which appeal is available.  See Cooper v. Neven, 641 F.3d 322, 326 (9th Cir. 2011) (citing O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Picard v. Connor, 404 U.S. 270, 275 (1971)).  "[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle petitioner to relief."  Gray v. Netherland, 518 U.S. 152, 162-63 (1996).

In this case, Petitioner exhausted Claim VI.  In his petition for review to the California Supreme Court, Petitioner asserted the following:

29

On February 21, 2009, appellant filed a motion for new trial. In a declaration included with the motion, Jim stated under oath that he had learned from one John White, an inmate in the jail where he was incarcerated, that his co-defendant, Carline Balbuena, told White she was going to lie when she testified in court; and in particular, that she was going to claim, falsely, that Jim had forced KC to eat his own feces as a disciplinary measure for defecating in his pants. When Carline testified, she did indeed so testify. She said that although she did not actually see it, she suspected that Jim had made KC eat his own feces as a penalty for having defecated in his underwear. She thought this because KC threw up afterward, and the vomit smelled like feces.

Based on this information, appellant asked the court to grant him a new trial, so that Mr. White could testify to this important impeaching evidence.

The trial court assumed, for purposes of the motion, that Balbuena had made these statements to White. However, it denied the motion. Appellant submits here that the motion should have been granted.

Carline supplied the only evidence linking Jim to the crime. The refusal of the court to allow appellant the opportunity to present White's testimony to the jury deprived him of his due process right to a fair trial. (U.S. Const., Amends. V, VI, XIV.)

(Resp't's Lodged Doc. 5 at p. 36-37.) Petitioner's argument cited above provided the California Supreme Court with a statement of specific facts that purportedly entitle the Petitioner to relief along with a specific citation to a federal Constitutional guarantee. Accordingly, under these circumstances, Claim VI is deemed exhausted.

The United States Supreme Court has expressly left open the question of whether an actual innocence claim based on newly discovered evidence is cognizable for federal habeas review in a non-capital case. See Dist. Attorney's Office for Third Judicial Dist. v. Osbourne, 129 S.Ct. 2308, 2321 (2009) (stating whether federal constitutional right to be released upon proof of "actual innocence" is an open question); Herrera v. Collins, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state proceeding."). In the absence of Supreme Court authority establishing the

30

1    cognizability of a freestanding actual innocence claim on federal habeas review, the state court's

2    rejection of this Claim could not be contrary to, or involve an unreasonable application of clearly

3    established federal law.  See Carey v. Musladin, 549 U.S. 70, 77 (2006) ("Given the lack of

4    holdings from the Court regarding the [issue in dispute,] it cannot be said that the state court

5    'unreasaonabl[y] appli[ed] clearly established Federal law.'") (quoting 28 U.S.C. § 2254(d)(1));

6    Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates

7    clearly established federal law relating to the legal issue the habeas petitioner raised in state

8    court, the state court's decision cannot be contrary to or an unreasonable application of clearly

9    established federal law." (citation omitted)).

10           Nevertheless, even if Petitioner did state a cognizable federal habeas argument within

11   Claim VI, he still would not be entitled to federal habeas relief.  The threshold to make out a

12   successful freestanding claim of actual innocence is "extraordinarily high" and the showing

13   needs to be "truly persuasive."  See Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997).

14   Accordingly, "a habeas petitioner asserting a freestanding innocence claim must go beyond

15   demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."

16   Id. (citing Herrera, 506 U.S. at 442-44 (Blackmun, J., dissenting)).  Petitioner fails to make this

17   showing.  Petitioner's "newly discovered" evidence is based on hearsay.  The Supreme Court has

18   observed that evidence based on hearsay is particularly suspect because it is obtained without the

19   benefit of cross-examination and the ability to make credibility determinations.  See Herrera, 506

20   U.S. at 417.  The purported statement that Petitioner heard from Mr. White does not

21   affirmatively prove that he is probably innocent.  By way of example only, Balbuena's credibility

22   was already front and center at trial as it was already lacking in several respects based on the

23   evidence already produced at trial, yet the jury still convicted Petitioner.  While Mr. White's

24   hearsay statement may have impeached some of Balbuena's testimony, it is not "truly

25   persuasive" to affirmatively prove that Petitioner is probably innocent.  Therefore, Petitioner is

26   not entitled to federal habeas relief on this Claim even if it did raise a cognizable federal habeas

31

1   argument.

2                        VI.  REQUEST FOR AN EVIDENTIARY HEARING

3          Petitioner requests an evidentiary hearing on his Claims in his traverse.  A court presented

4   with a request for an evidentiary hearing must first determine whether a factual basis exists in the

5   record to support petitioner's claims, and if not, whether an evidentiary hearing "might be

6   appropriate."  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski,

7   431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also

8   demonstrate that he has presented a "colorable claim for relief."  Earp, 431 F.3d at 1167

9   (citations omitted).  To show that a claim is "colorable," a petitioner is "required to allege

10  specific facts which, if true, would entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th

11  Cir. 1998) (internal quotation marks and citation omitted).  In this case, an evidentiary hearing is

12  not warranted for the reasons stated in supra Part V.  Petitioner failed to demonstrate that he has

13  a colorable claim for federal habeas relief.  Moreover, the Supreme Court has recently held that

14  federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the

15  state court that adjudicated the claim on the merits" and "that evidence introduced in federal

16  court has no bearing on" such review.  Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 1400 (2011).

17  Thus, his request will be denied.

18                                VII.  CONCLUSION

19         For all of the foregoing reasons, IT IS HERBEY ORDERED that Petitioner's request for

20  an evidentiary hearing is DENIED.

21         IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be

22  DENIED.

23         These findings and recommendations are submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

25  after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  May 30, 2012

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE